ABNER M. LEWIS *et al.*

*v.*

S. B. MONTGOMERY *et al.*

*Filed at Springfield, April 3, 1893.*

1. ADVANCES—*whether loans or advance payments—liens on the goods consigned.* Advances made by a factor to the consignor of goods under an express contract, which provides that the former shall reimburse himself out of the proceeds of the goods when sold, are not in the nature of loans of money, but they are payments in advance as to a part of the price. Such advances are liens upon the goods in the hands of the factor, as the primary fund to which he must look for reimbursement, and until that fund is exhausted, he can have no recourse upon the consignor, whose liability is contingent, and only for the deficiency in the proceeds of the goods when sold.

2. CORPORATION—*indebtedness in excess of capital stock—advances by a factor.* Advances by a factor to a manufacturing corporation of a part of the invoice price of goods, under a contract that the former is to reimburse himself from the proceeds of the goods when sold, do not create any substantial liability or indebtedness against the corporation while the goods are in the hands of the factor and before their sale, within the meaning of Sec. 16 of the act of 1872, relating to corporations.

3. SAME—*fixing the salaries—whether creating any indebtedness.* The fixing of the salary of the superintendent of a corporation and that of the secretary, in the absence of other proof, is not sufficient to show that any corporate debt was thereby incurred, as it will be presumed that such salaries were paid as they accrued.

4. SAME—*proof of incurring the indebtedness.* To show the incurring of an indebtedness of a corporation in excess of its capital stock, it is not sufficient to show that various expenditures were ordered or authorized by the board of directors, when, so far as it appears, such expenditures may have been met at the time by cash payments. It must be shown that such expenditures resulted in indebtedness, or formed part of the indebtedness in excess of the capital stock.

5. SAME—*liability of directors for indebtedness in excess of capital stock—how created.* The liability under Sec. 16 of the act relating to corporations is created only where the indebtedness of the corporation exceeds the amount of the capital stock, and is imposed only upon the directors and officers assenting to such excess of indebtedness. This means assenting to its creation. A recognition of the indebtedness by the directors, after it has been so contracted as to become binding on the corporation, will not charge them with this statutory liability.

6. The statutory liability of the directors and officers of a corporation for its debts is not predicated upon the negligence of such officers in the discharge of their official duties, but upon the fact of their having "assented" to the indebtedness which constitutes the excess over the amount of the capital stock.

7. SAME—*liability of directors for the acts of an agent.* The board of directors by constituting a general financial agent of the corporation, by appointment or by sufferance, does not make him the agent of the directors so as to make his acts their acts, in creating a corporate indebtedness in excess of the capital stock of the corporation, and thereby make them liable to creditors.

8. The directors, through the governing body of the corporation, are only its officers and agents; and any subordinate agent appointed by them, or acting by virtue of their sufferance or recognition, does not thereby become their agent, but the agent of the corporation. His acts are the acts of the corporation, so as to make it liable for debts incurred by him on its behalf; but they are not the acts of the directors, unless commanded or authorized by them.

9. The fact that the directors of a corporation might have interposed to prevent the general agent from running the corporation in debt beyond the amount of its capital stock, or that they have failed in other respects to perform their appropriate functions, may be charged as negligence, but it fails to establish their assent to the indebtedness thus contracted.

10. SAME—*liability of directors—stricti juris.* The liability created by the statute is like that of a surety, *stricti juris,* and therefore the words employed should be interpreted according to their plain and obvious meaning, and should not be extended by construction so as to embrace cases not clearly within the terms of the statute.

APPEAL from the Appellate Court for the Third District;— heard in that court on appeal from the Circuit Court of Schuyler County; the Hon. CHARLES J. SCOFIELD, Judge, presiding.

Mr. WILLIAM STREET, for the appellants:

"If the indebtedness of any stock corporation shall exceed the amount of its capital stock, the directors and officers of such corporation assenting thereto shall be personally and individually liable for such excess to the creditors of such corporation." *R. S.,* Ch. 32, Sec. 16.

The liability under this statute is to all the creditors, and is enforcible only in equity. *Low* v. *Buchanan*, 94 Ill. 76; *Eames* v. *Doris*, 102 Ill. 350–358; *Rounds* v. *McCormick et al.*, 114 Ill. 252.

This statute is remedial, not penal, and should be liberally construed. Equity never enforces a penalty. If the statute were penal it would be enforced at law only, and each creditor would sue for himself regardless of the others. Penal statutes are very strictly construed; remedial ones liberally.

Commission merchants are general agents for the sale of the goods sent to them by their principal. They are in no sense purchasers, but only agents to sell. They have a lien upon the goods in their possession for all advances made by them to, or for, their principal, and all other charges connected with their employment as his factors. But the principal may at any time satisfy their demands and resume absolute control of the goods. A debt to a factor is as much a part of the indebtedness as if it were owing to any other creditor of the principal. *1 Parsons on Contracts*, *91, *95, *98, *99; 3 id. *234, *258 to *260; *Story on Agency*, Secs. 33, 112, 376 and 410; *Story on Bailments*, Sec. 455 (4); *Gray* v. *Agnew*, 95 Ill. 315; *Winne* v. *Hammond*, 37 Ill. 99; *Saladin* v. *Mitchell*, 45 Ill. 79; *Moeller* v. *McLagan*, 60 Ill. 317; *Fourth National Bank* v *American Mills Co.*, 11 Sup. Ct. Rep. 52; id. 137.

Accounts current sent by commission houses to their principals, and retained without objection, are sufficient evidence of the indebtedness of the principal to the commission merchant. This is true, even though the commission house still has a large amount of the principal's goods in its hands. *Eichel et al.* v. *Sawyer et al.*, 44 Fed. Rep. 845; *McCord* v. *Manson*, 17 Ill. App. 118; *Miller* v. *Bruns*, 41 Ill. 293; *Mackin* v. *O'Brien*, 33 Ill. App. 474, 476.

Warren's authority will be presumed from the circumstances, and may be implied from the conduct or acquiescence of the directors. *Martin* v. *Webb*, 110 U. S. 7; *Singer Manf. Co.* v. *Holdfodt*, 86 Ill. 455; *Darst* v. *Gale*, 83 Ill. 136; *McDonald* v. *Chisholm*, 131 Ill. 273; *Burch* v. *West*, 134 Ill. 258; *Union Mut. L. Ins. Co.* v. *White*, 106 Ill. 67; *C. B. & Q. R. R. Co.* v. *Coleman*, 18 Ill. 298; *Lesher* v. *Wabash Nav. Co.*, 14 Ill. 84; *Chicago Building Soc.* v. *Crowell*, 65 Ill. 453.

The company having received and used in its legitimate business every dollar of the indebtedness proved against it, is, together with all its officers, directors and stockholders, forever estopped from denying the validity of such indebtedness, and the assent of the board of directors thereto is conclusively presumed. This presumption would prevail, even though the acts by which the indebtedness was contracted had been *ultra vires.* But in this case they were all created and used for lawful purposes. *Bradley* v. *Ballard*, 55 Ill. 413; *Ottawa N. P. R. Co.* v. *Murray*, 15 Ill. 336; *Aurora Agl. & Hort. Soc.* v. *Paddock et al.*, 80 Ill. 263; *Chicago Building Soc.* v. *Crowell*, 65 Ill. 453; *P. & S. R. R. Co.* v. *Thompson*, 103 Ill. 187; *Thomas* v. *Citizens' Horse Ry. Co.*, 104 Ill. 462; *West et al.* v. *Madison Co. Ag'l Board*, 82 Ill. 205; *Ward* v. *Johnson et al.*, 95 Ill. 215, 240; *E. St. Louis* v. *E. St. L. G. L. & C. Co.*, 98 Ill. 415; *Benefit Association* v. *Blue*, 120 Ill. 121.

Where officers, directors and stockholders allow debts to be contracted for merchandise, and borrowed money to be used, and which is used in the legitimate business of the company, and stand idly by doing nothing to prevent it, in favor of creditors, their assent to such indebtedness is conclusively presumed.

Mr. W. L. VANDEVENTER, Mr. S. B. MONTGOMERY and Mr. DAVID H. GLASS, for the appellees:

As to what is an assent to the creation of a debt by the creditors. *Welch* v. *Sackett*, 12 Wis. 257; *Patterson* v.

*Stewart,* 41 Minn. 85; *Patterson* v. *Robinson,* 36 Hun, 623; 116 N. Y. 193.

Our own Supreme Court have expressly declared the liability of a director under this section to be like that of a surety, *stricti juris. Woolverton* v. *Taylor,* 132 Ill. 198.

Statutes imposing these severe personal liabilities and obligations are uniformly construed strictly by the courts. *Bruce* v. *Platt,* 80 N. Y. 381; *Gray* v. *Coffin,* 9 Cush. 199; *Child* v. *Boston & Fair Haven Iron Works,* 137 Mass. 519; *Chase* v. *Lord,* 77 N. Y. 1; *Allison* v. *Coal Company,* 87 Tenn. 60; 1 Beach on Corp., S. 263.

This statute is clearly in derogation of the common law, and all such statutes are invariably to be construed strictly. *Thompson* v. *Weller,* 85 Ill. 198; *Canadian Bank* v. *McCrea et al.,* 106 Ill. 289; *Knower* v. *Haines,* 31 Fed. Rep. 512; *Pollard* v. *Bailey,* 20 Wall. 520; *Fourth National Bank* v. *Franklyn,* 120 U. S. 747; *Roke* v. *Thomas,* 56 N. Y. 559; *Union Iron Co.* v. *Pierce,* 4 Biss. 327; *Irvine* v. *McKeon,* 23 Cal. 472; 24 N. Y. 148; 46 Me. 377, and 3 Dutch. 148.

In Thompson's case, *supra,* the Supreme Court says concerning such statutes: "Courts can not properly give force to the statute beyond what is expressed by its words, or necessarily [*sic*] implied from what is expressed."

There is no liability in this case at common law. *Knower* v. *Haines, supra.*

It is insisted by appellants that the moneys advanced by the commission men in New York City upon the consignment of goods to them constitute "indebtedness" for the payment of which directors may be charged personally, or rather which may and must be counted and estimated in determining the question of excessive indebtedness. This construction has no foundation in law, equity or reason. Such advancements are in no proper legal sense corporate debts, within the meaning of the 16th section. That section has reference solely to debts or indebtedness, technically

speaking.  *Gihon* v. *Stanton,* 5 Selden (9 N. Y.), 476;
*Gilbert* v. *McGinnis,* 114 Ill. 28; *Cable* v. *Gaty,* 34 Mo.
573; *Cable v. McCune,* 26 Mo. 371; Mechem on Agency,
Sec. 1014; *Wolfe* v. *Koppel,* 2 Denio, 368; *Swan* v. *Nesmith,*
7 Pick. 220; *Lewis Bros. & Co.* v. *Breem,* 33 Md. 412.

There is no proof of knowledge of the condition of the
affairs of the corporation on the part of the appellees.
Knowledge of what the books and papers would have shown
is not imputed.  *Movins* v. *Lee,* 30 Fed. Rep. 306; *Briggs* v.
*Spaulding,* 141 U. S. 132; *Brannin* v. *Loving,* 82 Ky. 370.

The mere fact of being a director is not, *per se,* sufficient
to make a person liable for the frauds and misrepresenta-
tions of the active managers of a corporation.  Some knowl-
edge of and participation in the act claimed to be fraudulent
must be brought home to him.   Active managers of a cor-
poration are the agents of the corporation and not of the
officers or directors as individuals.  *Movins* v. *Lee,* 30 Fed.
Rep. 298–306; *Arthur* v. *Griswold,* 55 N. Y. 400; *Percy*
v. *Millaudon,* 8 Martin (La.) N. S. 58; *Wakeman* v.
*Dally,* 51 N. Y. 27.

Mr. L. A. JARMAN, for the appellee, W. B. Ray.

Mr. CHIEF JUSTICE BAILEY delivered the opinion of the
Court:

This was a bill in chancery, brought by certain creditors
of the Rushville Shawl Mills, a corporation, against the di-
rectors and officers of the corporation, to enforce the per-
sonal liability imposed by section 16, of the "Act Concern-
ing Corporations," approved April 18, 1872.   1 Starr &
Cur., 616.   The Rushville Shawl Mills was organized under
that act in April, 1885, with a capital stock of $32,000,
divided into 3,200 shares of $10 each, and at its organiza-
tion, Augustus Warren subscribed for and became the
owner of 2,400 shares of its stock, the remaining 800 shares
being subscribed for and taken by 33 other persons, in
amounts ranging from 5 to 100 shares.

The number of directors of the corporation was fixed at seven, the entire board being elected annually. Of the seven elected in April, 1885, four, viz., Augustus Warren, S. B. Montgomery, George E. Walker and John S. Little, were re-elected each year, and served as directors, until the corporation became insolvent and went into the hands of a receiver, in November, 1888. Of the other three members of the original board, Augustus Nell served until April, 1886, when he was succeeded by Thomas Wilson; William B. Ray until April, 1887, when he was succeeded by John S. Bagby, and Albert H. Seeley until April, 1888, when he was succeeded by David H. Glass. The first board of directors elected S. B. Montgomery president, Albert H. Seeley vice-president, John S. Bagby treasurer, and George T. Whitson secretary, and they were re-elected to the same offices each year, except that John S. Little was elected vice-president in April, 1888. Lester Gordon was appointed to the position of mechanical superintendent, and occupied that position during all the time the corporation was doing business.

The bill makes all of the above named parties defendants, and alleges that, on November 7, 1888, the date of the failure, the corporation was indebted to the amount of more than $36,000 in excess of its capital stock, and that the above named parties were the directors and officers of the corporation at the time of the incurring of such indebtedness in excess of the capital stock, and assented to the incurring of such excess of indebtedness.

At the hearing, which was had on pleadings and proofs, the bill was dismissed as to all the defendants except the corporation and Augustus Warren for want of equity, and a decree was rendered against the corporation and Warren by default in accordance with the prayer of the bill. On appeal by the complainants to the Appellate Court, the decree was affirmed, and by a further appeal, the complainants now bring the record to this court, and assign for

error here, as they did in the Appellate Court, that portion of the decree dismissing the bill as to all the defendants except the corporation and Warren.

It appears that the Rushville Shawl Mills, for the purpose of disposing of the goods which it manufactured, entered into contracts with certain commission merchants in Chicago and New York, to the effect that such merchants should become its factors in the sale of its goods, and should, on receipt of consignments of goods, advance to it in cash, a certain per cent of the invoice price of the goods, and on making sale, retain the amount of their advances, commissions, expenses, etc., and account to it for the residue. A large portion of the indebtedness which the complainants seek to have taken into account to make up an amount in excess of the capital stock of the corporation consisted of the advances made by its factors under these circumstances, and for which they held goods that constituted the primary fund out of which such advances were to be repaid, and out of which, as it seems, they were all ultimately repaid. Thus, taking the statement of the accounts furnished us by the complainants' counsel in his brief, and which we may justly assume is as favorable to the complainants as the evidence fairly warrants, the indebtedness of the corporation March 30, 1886, the close of the first year of its business, without taking into account the advances made by its factors, was $11,691.72, the amount of such advances being $19,792.81. On the 31st day of March, 1887, the amount of advances was $27,725.16, and the amount of other indebtedness was $23,325.88. March 1, 1888, the advances were $34,392.46, and of other indebtedness $33,626.71. On November 7, 1888, the day of the failure, the advances aggregated $27,120.60, and other indebtedness $38,047.46.

Assuming the correctness of these statements without attempting to verify them by the record, it appears that, if the advances made by factors in performance of the con-

tracts under which goods were consigned to them for sale
are not to be taken into account, the indebtedness of the
corporation did not exceed the amount of its capital stock
until about March 31, 1888, and then only by a small
amount, and that the excess at the time the corporation
failed was only $6,047.46.

While, as we view the evidence, the decision of the case
does not necessarily call for a decision of the question
whether these advances should be regarded as indebtedness
of the corporation, within the meaning of the sixteenth
section of the "Act Concerning Corporations," still we are
inclined to the opinion that they can not be so regarded.
The advances were made in pursuance of the terms of
express contracts on the part of the factors to advance a
certain per cent of the invoice price of the goods consigned
to them for sale, and to reimburse themselves out of the
proceeds of the goods when sold. These advances were
therefore not in the nature of loans of money to the con-
signor, but a payment in advance of a portion of the pro-
ceeds for which the factors would, in the due performance
of their duties as factors, be ultimately required to account
to their consignor. No one, we think, will contend that,
after making the advances, the factors could have aban-
doned their undertaking to sell, and have successfully
maintained a suit against their consignor to recover back
their advances. They were made on the credit of the
goods in their hands as the primary fund to which they
were to look for reimbursement. Until that fund was
exhausted, they clearly could have no recourse upon their
consignor. The liability of the consignor was contingent,
and only for the deficiency, if there should be any, in the
proceeds of the goods when sold. As there proved to be
no deficiency when the goods were sold, the advances being
fully paid out of their proceeds, we are unable to see how
these advances can be held to have constituted any sub-
stantial liability or indebtedness against the corporation

while the goods were in the hands of the factors and before their sale.

Upon this question, the case of *Gihon* v. *Stanton*, 9 N. Y. 476, is very much in point. The proposition decided in that case was, that where a commission merchant pays a draft drawn against a consignment for sale, the proceeds of the property are the primary fund to which he must look for reimbursement, and that he can not charge the consignor personally, without showing the fund to be insufficient. In discussing this question, the court said: "It would seem, from an examination of a long series of cases on this subject, that hardly any one had ever thought of contending that a factor or commission merchant, who, for the sake of inducing consignments to himself, makes advances to the consignor upon the faith of the goods consigned, and on anticipation of their avails, could, without rendering an account of the disposition of the goods, or of their proceeds, turn immediately around and sue and recover back the amount of his advances." And again: "From these cases it is strongly to be implied, that the factor or commission merchant must first have recourse for reimbursement to the fund in his hands, before resorting to his principal. That the credit, where a commission merchant makes advances upon consignments to him, is given primarily to the fund to be derived from the sale of the property consigned, would seem to result from the very nature of the transaction. The object of the consignor is, not to borrow money, but to realize, in advance, some portion of the avails of his property; that of the consignee is, not to make a loan of money for the accommodation of the consignor, or for the sake of the interest, but to increase the profits of his business, which depend upon the amount of consignments he can secure."

We are referred to the recent case of *Thacher* v. *King*, 156 Mass. 490, as laying down a different rule. In that case, the principal question before the court, and the one

to which the discussion appearing in the opinion is applicable, was, whether an indebtedness of a corporation to one of its directors, should be taken into account at all, in determining the liability of directors, under a statute of Massachusetts, which made the officers of the corporation jointly and severally liable, when the debts of the corporation exceeded the amount of its capital stock, to the extent of such excess. It appeared that a part of the indebtedness to the director arose from advances made by his firm as "selling agents" of the corporation. The court held, without assigning any reasons for its decision, that the indebtedness arising in that way, as well as the residue, should be taken into account. It may be further observed that the report fails to show what the relations of the "selling agents" to the corporation were, or whether they were factors in the legal sense of that term, or entitled to the rights which belong to that peculiar species of commercial agents. The precise question before us in the present case seems to have received but little consideration, and the decision therefore furnishes but very little aid in its solution. We think the rule laid down in *Gihon* v. *Stanton*, *supra*, is better supported by authority, and rests upon better reason, and we are inclined to adopt the view it presents.

But whether this is so or not, there is another ground upon which the decree of the Circuit Court must be affirmed. The evidence fails to show that any of the directors or officers of the corporation, with the exception of Warren, assented to the excess of indebtedness over the amount of the capital stock. The evidence shows that the manufacturing establishment owned and operated by the corporation formerly belonged to Warren, and that he turned it over to the corporation at its organization for the sum of $28,000, of which $24,000 was paid by the issue to Warren of the stock of the corporation for which he had subscribed, the residue being secured to him by the promissory notes of the corporation. When the business commenced,

Warren, though not appointed by the directors to the position of superintendent or business manager, assumed the control of the business of the corporation, and maintained such control, in fact, so long as the business continued. The directors seem to have had implicit confidence in him and in his business sagacity and integrity, and doubtless in consideration of the fact that he was the owner of three-fourths of the stock of the corporation, allowed him to manage the business, without substantial interference on their part, and paid very little attention to it themselves.

The evidence mainly relied upon to charge the directors, consists of the record of the proceedings of the board at its various meetings during the time the corporation was doing business. By the by-laws, the regular meetings of the board were appointed to be held monthly, and during the first year, these meetings were held with considerable regularity, and several special meetings were also called. During the subsequent history of the corporation, however, but few meetings were held. Thus, of the regular meetings appointed to be held during the two years and a half intervening between the annual meeting of April, 1886, and the failure of the corporation, twenty-two failed for want of a quorum.

During the first year, the board seems to have authorized certain expenditures of money, and the incurring of a certain amount of indebtedness. At its first meeting held in April, 1885, the salary of the superintendent was fixed at $1,000 per year, and that of secretary at $40 per month. Similar action was taken at the commencement of each subsequent year, except that the salary of superintendent was raised to $1,200 per year, and that of secretary to $50 per month, but it does not appear that any indebtedness was thereby incurred, since, there being no evidence to the contrary, it will be presumed that these salaries were paid as they accrued. The board also at its first meeting authorized the expenditure of $45 for books and stationery. At a meet-

ing held April 20, 1885, the board decided to build a house for the picker, and appointed a committee to make a con-- tract for such building, and the committee reported a few days later that it had let the contract for $270.   April 23, 1885, the purchase of the mills of Warren was consummated, and it was ordered that, for the residue of the purchase money not paid by the shares of stock issued to him, the corporation execute to him its two promissory notes for $2,000 each, due in one and two years, and bearing interest at the rate of eight per cent per annum.   At the same meeting, it was ordered that the outlet to the pond be deepened six inches, and supplied with eight inch tile, and a committee was appointed to procure the tile.   It was also ordered that $15,000 insurance be placed upon the property of the corporation, and a contract was made for coal to supply the mill.   At an adjourned meeting held April 24, 1885, a committee was appointed to receive bids for a fence of a certain description around three sides of the reservoir, and make a contract therefor, and the committee afterwards reported that it had let the contract for $27.   May 5, 1885, the secretary was authorized to rent a lock-box at the post office, and procure what stationery he should need.

June 5, 1885, a special meeting was called for the purpose of making a contract with a certain firm of commission merchants doing business in Chicago to sell the product of the mill for one year, and such action was taken that an arrangement of that character was made, under which goods were consigned to that firm, and advances were made by the firm on the goods so consigned.   July 7, 1885, the secretary reported to the board that he had borrowed $1,000 for ninety days, and that he and the president had given a note therefor and pledged a certain number of shawls as security.   This action was approved by the board, and the president and secretary were authorized to borrow $5,000

more, and execute a note or notes therefor and pledge goods to secure the same. August 26, 1885, a meeting was called for the purpose, as stated by Mr. Warren, to make arrangements for money to pay bills due and coming due September 1st, but all the action taken seems to have been, to authorize superintendent Gordon to call on the commission house in Chicago and notify them that the board considered itself released from its contract with them, and to take up the samples in their hands, or leave them upon such terms as he might deem best.

At a meeting held September 1, 1885, a committee was appointed to confer with the commission house in Chicago, and have an understanding as to what their intentions as to selling the shawls of the corporation were. Also at a meeting held January 5, 1886, it was ordered that $5,000 additional insurance be placed on the property. A committee was at the same time appointed to have the office ceiled, so as to prevent water dripping on to the goods. February 16, 1886, the action of Warren and Gordon in buying a hollow plate press, and trading old machinery in part payment therefor, was approved. In addition to the foregoing, it appears from the records of the board, that at several of the meetings, the report of the secretary was presented and approved, but the reports themselves are not in evidence, nor is there anything tending to show their contents, nor what information, if any, as to the fiscal concerns of the corporation was thereby communicated to the board of directors.

The foregoing is, in substance, the entire action of the board, during the first year the corporation was doing business, so far as is shown by the records of the board, having any reference to the expenditure of money, or the incurring of indebtedness. How much of these expenditures were paid in cash at the time they were made, and how much of the indebtedness thus incurred was paid before the end of the year, the evidence fails to show. But

whatever the facts may be in that respect, the entire indebtedness of the corporation at the end of the first year, not including the advances made by factors, was only $11,-691.72, or including those advances, it was a little less than the amount of the capital stock. It can not be claimed then, in any point of view, that the directors or officers of the corporation incurred any personal liability for the debts of the corporation, under the sixteenth section of the "Act Concerning Corporations," by anything done or omitted by them during the first year of the business.

After the annual election of directors held in April, 1886, neither the board nor the individual directors, with the exception of Warren, are shown to have interfered to any considerable extent in the business concerns of the corporation. The following seem to be the only measures adopted by the board having any material bearing upon the matter of the corporate indebtedness: At a meeting held April 14, 1886, the salary of the superintendent was fixed at $1,200 per year, and that of secretary at $50 per month, and the same action was repeated at the first meeting of the board after the annual election of directors in 1887 and 1888. May 11, 1886, a committee was appointed to enclose the well in the mill-yard, and the action of the committee in that behalf was approved at a subsequent meeting. It was also ordered that the superintendent have another set of cords put in operation and procure another dresser. May 17, 1887, a special meeting was called for the purpose of determining as to the matter of putting in certain new machinery, and it was ordered that such machinery, the approximate costs of which was to be only $625, should be put in. May 20, 1887, a committee was appointed to superintend the laying of a tile drain to bring water to the mill. July 30, 1887, it was ordered that unless a supply of water was secured by rain before the following Monday, the managers of the mill be authorized to tap the coal-bank

with one-inch gas pipe; and it was also ordered that a certain pump, engine and boiler be purchased. March 18, 1888, a committee was appointed to take an inventory, etc., and report the same to the stockholders at their annual meeting to be held on the 2d day of April ensuing. No further action seems to have been taken by the board until October 6, 1888, when it was ordered that the corporation assign to Little, as security for loans made to it by the Bank of Rushville, all goods consigned to a certain commission house in New York, and also mortgage to him its real estate and machinery. November 3, 1888, which was the last meeting of the board prior to the failure, the secretary was ordered to hypothecate certain goods belonging to the corporation to raise money with which to pay the operatives in the mill. At many if not most of the meetings of the board during this period, what is called the report and balance sheet of the secretary seems to have been presented and approved, but there is no evidence tending to show of what those reports and balance sheets consisted.

There is little if any evidence tending to show that these various expenditures ordered or authorized by the board during this period resulted in any indebtedness, or formed any part of the indebtedness in excess of the capital stock of the corporation, since, so far as appears, most if not all of these expenditures may have been met at the time by cash payments. Nor are we able to find any evidence, except that furnished by the record of the proceedings of the board, which tends to charge the directors, with the exception of Warren, with any direct or personal agency in the incurring or contracting of the corporate indebtedness. Except so far as they acted officially at the meetings of the board, they are not shown to have personally taken any part in the corporate business. It is not shown that they personally entered into any contracts, made any purchases, transacted any business, or in any way interfered with the corporate dealings.

The evidence is clear that Warren, during all the time the corporation was doing business, was in fact its general financial manager, and had complete and unquestioned control of its business affairs. Purchases and sales were made and indebtedness incurred by him at his discretion. The directors, having full confidence in him, and recognizing the preponderating influence to which the ownership of three-fourths of the stock of the corporation seemed to entitle him, allowed him to manage the business substantially as he pleased, and failed to keep themselves informed as to the financial situation. That in all this they were grossly recreant to their legal duties as directors and officers of the corporation goes without saying. But whether they thereby incurred the statutory liability for the debts of the corporation in excess of the amount of the capital stock presents quite another question.

The provisions of the statute are as follows: "If the indebtedness of any stock corporation shall exceed the amount of its capital stock, the directors and officers of such corporation, assenting thereto, shall be personally and individually liable for such excess, to the creditors of such corporation." It should be observed that the statutory liability is not predicated upon the negligence of the directors or officers in the discharge of their official duties, but upon the fact of their having "assented" to the indebtedness which constitutes the excess over the amount of the capital stock.

The contention of the complainants seems to be that as the board of directors is the governing body of the corporation, their constituting Warren its general financial agent, either by appointment or by sufferance, made him their agent, so as to warrant an application to them of the maxim *respondeat superior*, and to make his acts and assent the acts and assent of the directors. This position is clearly untenable. The directors, though the governing body of the corporation, are only its officers and agents, and any

subordinate agent appointed by them, or acting by virtue of their sufferance or recognition, does not thereby become their agent, put the agent of the corporation. His acts are the acts of the corporation, so as to make it liable for debts or obligations incurred by him on its behalf, but they are not the acts of the directors, unless commanded or authorized by them. The fact that the directors might have interposed to prevent Warren from running the corporation in debt beyond the amount of its capital stock, or that they failed in other respects to perform their appropriate functions, may be charged against them as negligence, but it fails to establish their assent to the indebtedness thus contracted.

In *Woolverton* v. *Taylor*, 132 Ill. 197, the statute sought to be invoked here was under consideration, and we there held, that while the liability imposed is not penal but contractual, it is like that of a surety and therefore *stricti juris*. This being the case, the statute should receive a construction in consonance with the nature of the obligation imposed. The words employed should be interpreted according to their plain and obvious meaning, and should not be extended by construction so as to embrace cases not clearly within the terms of the statute. The liability is created only where the indebtedness of the corporation exceeds the amount of the capital stock, and is imposed only upon the directors and officers assenting to such excess of indebtedness. This plainly means assenting to its creation. Manifestly, a recognition of the indebtedness by the directors after it has been so contracted as to become binding upon the corporation, should not have the effect of charging them with this statutory liability. After the indebtedness has been created by such agents and in such manner as to constitute it a valid obligation of the corporation, it becomes the duty of the directors to recognize its validity, and, so far as is in their power, provide for its payment.

The only question in this case then is, whether the directors and officers as to whom the complainants' bill was dismissed, are shown to have assented to the creation of the indebtedness which constitutes the excess over the amount of the capital stock of the corporation.   Such assent could only be given by some affirmative, voluntary act on their part, or at least some active participation or co-operation in the particular transactions out of which that indebtedness arose.   Not only is there an entire absence of proof of that or any other character tending to show assent on their part, but all or most of them expressly deny, in their testimony given at the hearing, that they gave their assent to, or had anything to do with, the creation of such indebtedness.   We think the evidence wholly fails to establish their liability under the statute, and that the bill was properly dismissed as to them.   The judgment of the Appellate Court, affirming the decree of the Circuit Court, will be affirmed.

*Judgment affirmed.*